USDC SCAN INDEX SHEET

















MNA    8/28/03    11:08
3:03-CV-01721   WEISS V. SUREBEAM CORPORATION
*1*
*CMP.*

ORIGINAL

1   MILBERG WEISS BERSHAD
      HYNES & LERACH LLP
2   WILLIAM S. LERACH (68581)
    DARREN J. ROBBINS (168593)
3   401 B Street, Suite 1700
    San Diego, CA  92101
4   Telephone: 619/231-1058
    619/231-7423 (fax)
5
    BLUMENTHAL & MARKHAM
6   NORMAN BLUMENTHAL (68687)
    DAVID R. MARKHAM (71814)
7   2255 Calle Clara
    La Jolla, CA  92037
8   Telephone: 858/551-1223
    858/551-1232 (fax)
9
    Attorneys for Plaintiffs
10

FILED

03 AUG 27 PM 2: 14

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____   DEPUTY ____

FARUQI & FARUQI, LLP
NADEEM FARUQI
320 East 39th Street
New York, NY  10016
Telephone: 212/983-9330
212/983-9331 (fax)

11              UNITED STATES DISTRICT COURT

12            SOUTHERN DISTRICT OF CALIFORNIA

13  EDWARD WEISS and DELAWARE          )  No. '03 CV 01721 JM/POR
14  CHARTER GTY. TRUST TR. MELVYN      )
    MANASTER IRA R/O, On Behalf of     )  CLASS ACTION
15  Themselves and All Others Similarly Situated,  )
                                       )  COMPLAINT FOR VIOLATION OF THE
16                      Plaintiffs,    )  FEDERAL SECURITIES LAWS
                                       )
17       vs.                           )
                                       )
18  SUREBEAM CORPORATION, LAWRENCE     )
    A. OBERKFELL and DAVID A. RANE,    )
19                                     )
                     Defendants.       )
20  _____)  DEMAND FOR JURY TRIAL

21       This writing/publication is a creative work fully protected by all applicable copyright laws, as well as by
22  misappropriation, trade secret, unfair competition and other applicable laws. The authors of this work have added value to the
    underlying factual materials herein through one or more of the following: unique and original selection, coordination,
    expression, arrangement, and classification of the information.
23
         No copyright is claimed in the text of statutes, regulations, and any excerpts from analysts' reports quoted within this
24  work.
25       Copyright © 2003 by William S. Lerach and Milberg Weiss Bershad Hynes & Lerach LLP.  William S. Lerach and
    Milberg Weiss Bershad Hynes & Lerach LLP will vigorously defend all of their rights to this writing/publication.
26
         All rights reserved – including the right to reproduce in whole or in part in any form.  Any reproduction in any form by
27  anyone of the material contained herein without the permission of William S. Lerach and Milberg Weiss Bershad Hynes &
    Lerach LLP is prohibited.
28



## INTRODUCTION

1.      This is an action on behalf of purchasers of SureBeam Corporation ("SureBeam" or the "Company") publicly traded securities during the period from March 16, 2001 to August 20, 2003 (the "Class Period"). SureBeam provides electronic irradiation systems and services for the food industry.

2.      During the Class Period, defendants caused SureBeam's shares to trade at artificially inflated levels through the issuance of false and misleading financial statements. As a result of this inflation, SureBeam was able to complete an initial public offering ("IPO") of 6.7 million shares, raising net proceeds of $60 million on March 16, 2001.

3.      On July 30, 2003, the Company issued a press release entitled "SureBeam to Delay Earnings Announcement." The press release stated in part:

> SureBeam Corporation announced today that it is delaying the release of its second quarter earnings from its planned date of July 31, 2003. As previously reported by the Company in its Current Report on Form 8-K/A filed on June 11, 2003, on June 9, 2003, Deloitte & Touche LLP ("Deloitte & Touche") was named as the Company's independent auditor for the year ending December 31, 2003, replacing KPMG LLP. The Company's management has not completed preparation of the financial statements for the second quarter and Deloitte & Touche has not yet completed its review of those statements. In particular, Deloitte & Touche has not completed their analysis on particular contracts and the Company's accounting treatment used for such contracts.
>
>      "We regret that this reporting delay is occurring," said SureBeam Chairman and Chief Executive Officer John C. Arme. "We intend to work hard to complete the process and we anticipate that our earnings will be released by August 12."

4.      On August 12, 2003, the Company issued another press release entitled "SureBeam to Delay Earnings Announcement." The press release stated in part:

> SureBeam Corporation announced today that it is further delaying the release of its second quarter earnings from its planned release date of August 12, 2003. The Company plans to file a Form 12b-25 with the Securities and Exchange Commission in connection with the Company's Form 10-Q for the second quarter of 2003 and the announcement of the Company's results for the second quarter of 2003 will be delayed until after the Company's Form 10-Q for the second quarter has been filed.
>
>      ***Deloitte & Touche LLP ("Deloitte & Touche") has not completed its reviews of the Company's financial statements. In particular, Deloitte & Touche has not completed its analysis on the accounting for specific contracts in prior years and the Company's accounting treatment used for its contracts.***
>
>      As previously announced by the Company in its Current Report on Form 8-K/A filed on June 11, 2003, on June 9, 2003, Deloitte & Touche LLP was named as

the Company's independent auditor for the year ending December 31, 2003, replacing KPMG LLP.

5.      On August 21, 2003, the Company issued a press release entitled "SureBeam Dismisses Auditor; Seeks to Resolve Issues." The press release stated in part:

> SureBeam Corporation announced today that it is dismissing its independent public auditor Deloitte & Touche LLP ("Deloitte & Touche"). On June 9, 2003, Deloitte & Touche was named as SureBeam's independent auditor for the year ending December 31, 2003, replacing KPMG LLP. Deloitte & Touche has raised issues of concern regarding accounting treatment used by SureBeam for certain transactions beginning in 2000. The Audit Committee and the Board of Directors of SureBeam have discussed these issues of concern with Deloitte & Touche and with SureBeam management.

> The Company believes that its financial statements which were audited by national accounting firms and filed with the Securities and Exchange Commission, were appropriate based on the facts and circumstances that existed at the time. However, the Board of Directors has determined that the issues raised by Deloitte & Touche are sufficiently important and that it wants these issues to be definitively resolved. Accordingly, the Board's Audit Committee is interviewing other national accounting firms for the purpose of conducting an independent review of these issues.

6.      The stock dropped to $1.55 per share on this news.

## JURISDICTION AND VENUE

7.      The claims asserted arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5 promulgated thereunder. Jurisdiction is conferred by §27 of the 1934 Act. Venue is proper pursuant to §27 of the 1934 Act. Defendant SureBeam has its principal place of business at 9276 Scranton Road, San Diego, California, and SureBeam and/or the Individual Defendants conduct business in this District and the wrongful conduct took place here.

## THE PARTIES

8.      (a)      Plaintiff Edward Weiss purchased SureBeam publicly traded securities as detailed in the attached Certification and was damaged thereby.

(b)      Plaintiff Delaware Charter Gty. Trust Tr. Melvyn Manaster IRA R/O purchased SureBeam publicly traded securities as detailed in the attached Certification and was damaged thereby.

9.      Defendant SureBeam provides electronic irradiation systems and services for the food industry.

10.    Defendant Lawrence A. Oberkfell ("Oberkfell") was Chairman, President and CEO of SureBeam. Oberkfell assisted in the preparation of the false financial statements and repeated the contents therein to the market.

11.    Defendant David A. Rane ("Rane") was CFO of SureBeam. Rane assisted in the preparation of the false financial statements and repeated the contents therein to the market.

12.    Defendants Oberkfell and Rane are the "Individual Defendants." They are liable for the false statements pleaded in ¶¶19-20, 22-27, 29-30, 32-40, as those statements were "group-published" information.

## BACKGROUND

13.    SureBeam was formed as a wholly owned subsidiary of The Titan Corporation ("Titan") in 1999 and was originally called Titan Pacification, Inc.

14.    Prior to August 4, 2000, the Company derived its revenues from the manufacturing of medical equipment sterilization and electronic food irradiation systems, providing medical equipment sterilization services and the manufacturing of linear electron beam accelerators for use by government agencies. Since August 4, 2000, its revenues have consisted of electronic food irradiation system sales, food processing revenue and revenues to Titan.

15.    SureBeam struggled to find customers who could and would pay for its irradiation systems. In order to show growth in this important segment, SureBeam recognized revenue from customers who could not pay, including a Brazilian affiliate, Tech Ion Industrial Brasil S.A. ("Tech Ion").

16.    In May 2000, Tech Ion entered an agreement with SureBeam for eleven electronic food irradiation systems, or approximately $55.0 million in revenue over the next three years. Under the percentage-of-completion method of accounting, $22.4 million was recognized from the agreement through September 30, 2001, even though Tech Ion did not have the ability to pay. In October 2001, purportedly in order to ensure the completion of the project with Tech Ion, SureBeam agreed with Tech Ion to purchase an additional 60.1% of SureBeam Brasil (a joint venture SureBeam had entered into with Tech Ion). In reality, this was the only way to reduce the huge receivable from Tech Ion. In connection with its purchase, SureBeam paid Tech Ion $750,000 upon the execution

- 3 -

of the agreement and was to pay an additional $250,000 upon the completion of other parts of the project. Most significantly, SureBeam also exchanged trade receivables of $22.4 million due from Tech Ion and forgave $3.5 million of a loan it had previously made to Tech Ion for building improvements and equipment.

17.    Thus, some 56% of the non-affiliated party revenue SureBeam recognized for 2000 and 2001 was from a party which could not pay and for which SureBeam would forgive its receivables. SureBeam's statements about its revenue, growth and business were false and misleading.

## FALSE AND MISLEADING STATEMENTS
## DURING THE CLASS PERIOD

18.    On March 15, 2001, the Company issued its Prospectus for the Company's IPO, wherein the Company raised net proceeds of $60 million.

19.    The Prospectus contained the Company's financial results for FY 2000 as follows:

| STATEMENT OF OPERATIONS INFORMATION: | 2000 |
|---|---|
| Revenues | $29,448 |
| Cost of revenues | 19,602 |
| Gross profit | 9,846 |
| Operating Expenses: | |
| Selling, general and administrative | 8,640 |
| Research and development | 524 |
| Income (loss) from operations | 682 |
| Interest expense, net | 3,611 |
| Income (loss) before tax | (2,929) |
| Income tax provision (benefit) | (1,130) |
| Net Income (Loss) | ($1,799) |
| Basic earnings (loss) per share: | |
| Net income (loss) | ($0.04) |
| Diluted earnings (loss) per share: | |
| Net Income (Loss) | ($0.04) |
| Shares used in computing basic earnings (loss) per share | 46,817 |
| Shares used in computing diluted earnings (loss) per share | 46,817 |

20.    With respect to the Company's revenue recognition policy, the Prospectus stated:

- 4 -

1    In December 1999, the SEC issued Staff Accounting Bulletin ("SAB") No.
     101, "Revenue Recognition in Financial Statements." This SAB summarizes the
2    SEC's view in applying generally accepted accounting principles to revenue
     recognition in financial statements. Our accounting policies comply with the
3    provisions of SAB 101.

4    21.    The IPO was successful in that SureBeam was able to sell 6.7 million shares at $10

5    per share for net proceeds of $60 million.

6    22.    On May 3, 2001, the Company issued a press release entitled "SureBeam Reports

7    First Quarter Results: Revenues of $5.5 Million; Pasteurization Capacity Continues to Increase With

8    the Construction of Two New Service Centers to Meet Expected Volume Demand." The press

9    release stated in part:

10    SureBeam Corporation today reported revenues of $5.5 million for the first quarter
      of fiscal 2001, an increase of 34% over $4.1 million in fiscal 2000, which excludes
11    the effect of the medical sterilization and government linear accelerator business.
      SureBeam's gross margin for the first quarter of 2001 was 46%, compared to 41% for
12    the first quarter of 2000. Pro forma net loss was $3.2 million or $0.07 per share, for
      the first quarter of fiscal 2001 compared to a net loss of $.5 million or $.01 per share,
13    for the first quarter of 2000. This is SureBeam's first earnings release following the
      Company's Initial Public Offering which was completed March 16, 2001.
14
      Including depreciation, amortization of goodwill and other purchased
15    intangibles, and deferred compensation, the net loss, in accordance with generally
      accepted accounting principles, for the first quarter of fiscal 2001 was $40.6 million
16    or $.84 per share, compared to a net loss of $.6 million, or $.01 per share, for the
      same period last year.
17
18    23.    On July 9, 2001, the Company issued a press release entitled "SureBeam Announces

      Preliminary Second Quarter Results." The press release stated in part:
19
20    SureBeam Corporation today announced preliminary second quarter results. In line
      with previous guidance, the Company expects to report revenues for the second
21    quarter of fiscal 2001 of between $8 and $10 million and pro forma net loss per share
      excluding depreciation, amortization of goodwill and other purchased intangibles and
22    deferred compensation of $0.05 to $0.07.

      Actual results for the quarter will be released August 14, 2001. A conference
23    call to discuss detailed results of the quarter will be held at that time.

24    24.    On August 14, 2001, the Company issued a press release entitled "SureBeam Reports

25    Second Quarter Results; Revenues of $9.6 Million; International Strategic Alliances Strengthened

26    with Saudi Arabian Agreement to Purchase Systems." The press release stated in part:

27    SureBeam Corporation today reported revenues of $9.6 million for the second quarter
      of fiscal 2001, an increase of 86% over $5.2 million in fiscal 2000, excluding the
28    effect of the medical sterilization and government linear accelerator business.
      Included in SureBeam's 2001 second quarter revenue of $9.6 million was $1.0

million of sales to an affiliate. Revenue from third parties was $8.6 million, an increase of 66% over the second quarter of 2000. SureBeam's gross margin for the second quarter of 2001, excluding affiliate sales, was 39% compared to 32% for the second quarter of 2000. Pro forma net loss was $2.5 million or $.05 per share, for the second quarter of fiscal 2001 compared to a net loss of $.1 million or $.00 per share, for the second quarter of 2000.

Including depreciation, amortization of goodwill and other purchased intangibles, and deferred compensation, the net loss, in accordance with generally accepted accounting principles, for the second quarter of fiscal 2001 was $9.2 million or $.16 per share, compared to a net loss of $.6 million, or $.01 per share, for the same period last year.

25.    On October 17, 2001, the Company issued a press release entitled "SureBeam Debuts New Food Safety Service Center in Chicago; Facility Doubles SureBeam's Processing Capacity for the Processing of Fresh or Frozen Meats and Other Food Products and Spices." The press release stated in part:

Tomorrow on October 18, SureBeam Corporation – innovator of the electron beam technology that safely removes dangerous bacteria from food – will debut its new Chicago Service Center, the nation's first SureBeam(R) facility capable of processing food simultaneously with SureBeam electron beam and x-ray technology.

"SureBeam's newest facility doubles SureBeam's processing capacity and gives greater processing flexibility," says Larry Oberkfell, SureBeam's president and CEO. "A key innovation is its capability to use high-volume e-beam and x-ray scanning systems for eliminating the threat of harmful food borne bacteria simultaneously, so as to accommodate differences in product size and shape."

26.    On October 17, 2001, Titan and SureBeam issued a press release entitled "Titan Announces Plan to Spin Off SureBeam." The press release stated in part:

The Titan Corporation and SureBeam Corporation today announced that the Board of Directors of Titan had adopted a definitive plan to spin off SureBeam in the form of a tax-free stock dividend to Titan shareholders within the next 12 months. The plan involves filing a letter ruling request with the IRS seeking approval of the tax-free distribution. Titan intends to file the letter ruling request within the next few weeks and intends to execute the spin off as soon as practical following the receipt of that ruling.

Titan has agreed, subject to the consent of its lenders, to purchase a perpetual and exclusive, non-royalty bearing license to use SureBeam's intellectual property on all applications other than the 1.8 trillion pound worldwide food, animal hides, and flowers markets in return for the following: 1) to make available to SureBeam a $50 million line of credit, 2) to convert the current $75 million debt owed Titan to equity via an exchange for SureBeam stock, and 3) a cash payment of $8 million.

27.    Also, on October 17, 2001, the Company issued a press release entitled "SureBeam Reports Record Revenues for Third Quarter and Gives Guidance for Fourth Quarter 2001 and Fiscal

2002; Company Also Announces Adoption by Titan's Board of Formal Plan to Distribute SureBeam

Shares to Titan Shareholders."  The press release stated in part:

> SureBeam Corporation today reported revenues of $14.5 million for the third quarter of fiscal 2001, an increase of 138% over $6.1 million in fiscal 2000, excluding the effect of the medical sterilization and government linear accelerator business. Included in SureBeam's 2001 third quarter revenue of $14.5 million was $2.8 million of sales to an affiliate. Revenue from third parties was $11.7 million, an increase of 92% over the third quarter of 2000, excluding the effect of the medical sterilization and government linear accelerator business.  SureBeam's gross margin for the third quarter of 2001, excluding affiliate sales, was 41% compared to 56% for the third quarter of 2000, excluding the effect of the medical sterilization and government linear accelerator business.  Pro Forma net loss was $1.5 million or $.03 per share, for the third quarter of fiscal 2000 compared to a pro forma net income of $.3 million or $.01 per share, for the third quarter of 2000.

> Including depreciation, amortization of goodwill and other purchased intangibles, and deferred compensation, the net loss, in accordance with generally accepted accounting principles, for the third quarter of fiscal 2001 was $7.7 million or $.14 per share, compared to a net loss of $.3 million, or $.01 per share, for the same period last year, excluding the effect of the medical sterilization and government linear accelerator business.

28.    Between October 23, 2001 and November 2, 2001, Company insiders sold over 1 million shares of SureBeam stock at prices ranging from $10.17-$13.61 per share for proceeds of $13.3 million.

29.    On February 11, 2002, the Company issued a press release entitled "SureBeam Reports Record Revenues for Three and Twelve Month Periods Ended December 31, 2001."  The press release stated in part:

> SureBeam Corporation today reported revenues of $11.6 million for the fourth quarter of fiscal 2001, an increase of 18% over $9.9 million in the comparable quarter of fiscal 2000. Included in SureBeam's 2001 fourth quarter revenue of $11.6 million was $12.5 million of sales to Titan Corporation (Titan), SureBeam's majority owner, related to the United States Postal Service (USPS) subcontract and $1.9 million of other sales to Titan. Revenue from third parties was negative $2.8 million, due to component parts that were transferred from third party contacts to the USPS subcontract in order to meet the contractual time constraints.  SureBeam's gross margin for the fourth quarter of 2001 and 2000 was 25%.  Pro forma net loss was $9.1 million, or $0.16 per share, for the fourth quarter of fiscal 2001 compared to a pro forma net income of $631,000, or $0.01 per share, for the fourth quarter of 2000.

> Including depreciation, amortization of goodwill and other purchased intangibles, and deferred compensation, the net loss, in accordance with generally accepted accounting principles, for the fourth quarter of fiscal 2001 was $16.9 million, or $0.29 per share, compared to net income of $44,000, or $0.00 per share, for the same period last year.

30.     On February 19, 2002, the Company issued a press release entitled "SureBeam Exchanges Approximately $75 Million in Outstanding Debt for SureBeam Stock." The press release stated in part:

> SureBeam Corporation – innovator of the electron beam technology that safely removes dangerous bacteria from food – today announced that it has completed on February 13, 2002 the exchange of all of its $75 million of debt with its parent company, Titan Corporation, in accordance with an October 2001 agreement between the two companies.  Under the terms of the agreement, Titan exchanged all of SureBeam's $75 million debt for SureBeam common stock at an average price of $9.54 per share.  On October 17, 2001, Titan announced that its Board of Directors had adopted a definitive plan to spin off SureBeam in the form of a tax-free stock dividend to Titan shareholders.  The equity Titan received as a result of this exchange is planned to be included in that tax-free stock dividend to Titan shareholders.
>
>     "Removing virtually all of SureBeam's debt with Titan is a major financial benefit for us as we prepare to spin off from Titan," said Larry Oberkfell, SureBeam's president and CEO.  "The execution of debt to equity exchange leaves SureBeam essentially debt-free at this time, giving us greater flexibility and more financial strength."

31.     Between March 4, 2002 and March 13, 2002, Company insiders (including defendant Oberkfell, who sold 350,000 SureBeam shares at $5.50-$5.78 per share for proceeds of over $2 million) sold 480,000 SureBeam shares for $2.86 million in proceeds.

32.     On April 25, 2002, the Company issued a press release entitled "SureBeam Reports Record First Quarter Revenues; Quarter Highlighted by Fresh Ground Beef Rollout at Retail and Restaurant Locations."  The press release stated in part:

> SureBeam Corporation today reported record revenues of $7.0 million for the first quarter of fiscal 2002, an increase of 28% over $5.5 million in the comparable quarter of fiscal 2001.  SureBeam's 2002 first quarter revenue of $7.0 million was comprised of $2.5 million of third party revenue, and $2.3 million related to the United States Postal Service subcontract and $2.2 million related to medical sterilization subcontracts, both with The Titan Corporation (Titan), SureBeam's majority owner....
>
>     Pro forma net loss was $3.8 million, or ($0.06) per share, for the first quarter of fiscal 2002 compared to a pro forma net loss of $3.2 million, or $($0.07) per share, for the first quarter of 2001.

33.     On July 29, 2002, the Company issued a press release entitled "SureBeam Reports Record Second Quarter Sales and Earnings and Gives Guidance for Fiscal 2002 and 2003."  The press release stated in part:

> SureBeam Corporation today reported record second quarter revenues of $10.8 million for fiscal 2002, an increase of 12% over $9.6 million in the second quarter of 2001.  SureBeam's gross margin was 35% for the second quarter of 2002 and

- 8 -

2001. The net loss, in accordance with generally accepted accounting principles, for the second quarter of fiscal 2002 was $5.1 million, or $0.08 per share, compared to a net loss of $9.2 million, or $0.16 per share, for the same period last year, a per share improvement of 50%. Pro forma net loss was $276,000, or $0.00 per share, for the second quarter of fiscal 2002 compared to a pro forma net loss of $2.5 million, or $0.05 per share, for the second quarter of 2001.

Revenues for the six month period ended June 30, 2002 were $17.8 million, an increase of 18% over $15.1 million for the same period in 2001. SureBeam's gross margin for the six month period ended June 30, 2002 was 28% compared to 39% for the six month period ended June 30, 2001. The net loss, in accordance with generally accepted accounting principles, for the six month period ended June 30, 2002 was $14.1 million, or $0.22 per share, compared to a net loss of $49.8 million, or $0.95 per share, for the same period last year. Pro forma net loss was $4.1 million, or $0.06 per share, for the six month period ended June 30, 2002 compared to a pro forma net loss of $5.7 million, or $0.11 per share, for the six month period ended June 30, 2001.

34.    On October 31, 2002, the Company issued a press release entitled "SureBeam Reports Third Quarter Sales and Earnings." The press release stated in part:

SureBeam Corporation today reported third quarter revenues of $7.0 million for fiscal 2002, and a loss per share of $0.16, consistent with the First Call consensus estimate of a loss per share of $0.16. Third quarter revenues of $7.0 million represented a decrease of 52% over $14.5 million in the third quarter of 2001. The net loss, in accordance with generally accepted accounting principles, for the third quarter of fiscal 2002 was $11.0 million, or $0.16 per share, compared to a net loss of $7.7 million, or $0.14 per share, for the same period last year.

Revenues for the nine-month period ended September 30, 2002 were $24.8 million, a decrease of 16% over $29.6 million for the same period in 2001. The net loss, in accordance with generally accepted accounting principles, for the nine-month period ended September 30, 2002 was $25.1 million, or $0.38 per share, compared to a net loss of $57.5 million, or $1.08 per share, for the same period last year.

35.    On December 2, 2002, the Company issued a press released entitled "SureBeam Corporation Announces $25 Million Private Placement of Common Stock; Funding to Finance Future Business Needs." The press release stated in part:

SureBeam Corporation today announced that it has entered into definitive purchase agreements, subject to certain closing conditions and the receipt of required consents, with respect to the private placement of approximately 5,276,315 shares of SureBeam's common stock at $4.75 per share to seven institutional investors resulting in gross proceeds to SureBeam of approximately $25,062,500. As part of the transaction, the Company will issue to the investors warrants to purchase an aggregate of approximately 1,319,079 additional shares of SureBeam's common stock at an exercise price of $6.00 per share for a period of five years. After commissions and expenses, the net proceeds to the Company will be approximately $23,308,125. The proceeds will be used for working capital needs and general corporate purposes.

1        36.    On February 20, 2003, the Company issued a press release entitled "SureBeam

2  Reports Revenues for Three and Twelve Month Periods Ended December 31, 2002."  The press

3  release stated in part:

> SureBeam Corporation today reported revenues of $12.1 million for the fourth
> quarter of fiscal 2002, an increase of 4% over $11.6 million in the comparable
> quarter of fiscal 2001.  Included in SureBeam's 2002 fourth quarter revenue of $12.1
> million was $5.6 million of revenue from investee (Saudi Arabia RESAL contract),
> $3.4 million of revenue from non-affiliated parties and $3.1 million of revenue on
> contracts for The Titan Corporation clients.  Food revenue, which includes revenue
> from non-affiliated parties and investee, represents an increase of $8.5 million over
> the same period in 2001.  Revenue from non-affiliated parties was comprised of $3.1
> million for system sales and $0.3 million of revenue from processing.  SureBeam's
> gross margin for the fourth quarter of 2002 was 5.7%, as compared to the same
> period in 2001 of 25%.  The net loss, in accordance with generally accepted
> accounting principles, for the fourth quarter of fiscal 2002 was $10.0 million, or
> $0.14 per share, compared to a net loss of $16.9 million, or $0.29 per share, for the
> same period last year.  Included in the net loss for the quarter ended December 31,
> 2002 was a loan receivable valuation reserve charge of $4.2 million.  Also included
> in the net loss was a non-cash charge of stock based compensation of $2.8 million
> and $5.1 million for the quarter ended December 31, 2002 and 2001, respectively.
>
> "Throughout 2002 the effectiveness and safety of the SureBeam technology
> was demonstrated for all to see as grocery store retailers accelerated their rollouts of
> SureBeam processed fresh ground beef," said Larry Oberkfell, President and CEO of
> SureBeam.  "Driving this was a significant expansion in the overall distribution of
> our professor customer sales of SureBeam processed fresh ground beef to both retail
> and foodservice customers.  Consumer demand is obviously growing, as folks are
> embracing this as an added measure of food safety in the products they purchase for
> their families.  As recently as September 2002, SureBeam processed fresh ground
> beef products could be found in less than 100 stores and that number has now grown
> to over 3,300.  Just this month alone, we rolled out fresh ground been to over 1,000
> new stores," Oberkfell continued.

      37.    On May 7, 2003, the Company issued a press release entitled "SureBeam Reported

Revenues for First Quarter 2003 and Updates Outlook for Year." The press release stated in part:

> SureBeam Corporation today reported revenues of $6.1 million for the first quarter
> of fiscal 2003, a decrease of 13% over $7.0 million in the comparable quarter of
> fiscal 2002.  The components of 2003 first quarter revenue compared to the first
> quarter of 2002 were:  non-affiliated party system sales and support of $1.9 million
> versus $1.2 million, an increase of 60%; investee system sales and support of $2.3
> million versus $1.1 million, in increase of 113%; The Titan Corporation systems
> sales and support of $1.6 million verus $4.5 million, a decrease of 64%; and food
> processing services revenue of $309,000 versus $263,000, an increase of 17%.  The
> decrease in The Titan Corporation system sales and support is primarily related to the
> decrease in work performed on the U.S. Postal Service contract during the first
> quarter of 2002.  The net loss, in accordance with generally accepted accounting
> principles, for the first quarter of fiscal 2003 was $6.7 million, or $0.09 per share,
> compared to a net loss of $9.0 million, or $0.14 per share , for the same period last
> year.  The net loss for the first quarter of fiscal 2003 was positively impacted by the
> reversal of stock-based compensation on unvested options related to employee
> termination of $2.6 million, or $0.03 per share.

- 10 -

1    "The first quarter of 2003 was a very difficult quarter for the Company.
2    However, we continued to make progress in our core food businesses," said David
     Rane, SureBeam Corporation's Chief Financial Officer. "As compared to the first
3    quarter of 2002, food system sales and support from non-affiliated parties and
     investee grew 86% and food processing services revenue grew 17%. Pounds
4    processed increased by 62% to 4.9 million pounds offset by a decrease in the average
     fee per pound charged. Also on the positive side, we expect to make the delayed
5    shipment to Saudi during the second quarter and our engineers have started to return
     to Vietnam to resume installation on the Vietnam contract," Rane continued.

6    38.    On June 3, 2003, the Company filed an 8-K which stated in part:

7    CHANGES IN REGISTRANT'S CERTIFYING ACCOUNTANT

8    The Audit Committee of the Board of Directors of SureBeam Corporation
     (referred to as "SureBeam," "our," or "we") considers and selects our independent
9    auditor. As recommended and directed by our Audit Committee, on June 3,2003 we
     terminated KPMG LLP ("KPMG") as SureBeam's independent auditor and effective
10   June 9, 2003, Deloitte & Touche LLP (Deloitte & Touche") was named as our
     independent auditor for the year ending December 31, 2003. KPMG was appointed
11   the independent auditor of SureBeam on April 15, 2002, following the dismissal of
     Arthur Andersen LLP ("Arthur Andersen") on April 9, 2002.
12
     During the year ended December 31, 2001, and the subsequent interim period
13   through April 9, 2002, we had no disagreement with Arthur Andersen on any matter
     of accounting principles or practices, financial statement disclosure, auditing scope
14   or procedure, which disagreement, if not resolved to Arthur Andersen's satisfaction,
     would have caused Arthur Andersen to make reference to the subject matter of such
15   disagreement in connection with its report, and there occurred no reportable events
     as defined in Item 304(a)( I )(v) of Regulation S-K as promulgated by the Securities
16   and Exchange Commission.

17   Arthur Andersen's report on our consolidated financial statements for the year
     ended December 31, 2001 did not contain an adverse opinion or disclaimer of
18   opinion, nor was that audit report qualified or modified as to uncertainty, audit scope
     or accounting principles. Arthur Andersen's report on our consolidated financial
19   statements for the year ended December 31, 2001 was issued on an unqualified basis
     in conjunction with the publication of our Annual Report to Stockholders and the
20   filing of our Annual Report on Form 10-K.

21   During the period from April 15, 2002 to June 3, 2003, we had no
     disagreements with KPMG on any matter of accounting principles or practices,
22   financial statement disclosure, auditing scope or procedure, which disagreement, if
     not resolved to KPMG's satisfaction, would have caused KPMG to make reference
23   to the subject matter of such disagreement in its report, and there
     occurred no reportable events as defined in Item 304(a)(1)(v) of Regulation S-K
24   promulgated by the Securities and Exchange Commission.

25   KPMG's report on our consolidated financial statements or the year ended
     December 31, 2002, did not contain an adverse opinion or disclaimer of opinion, nor
26   was that audit report qualified or modified as to uncertainty, audit scope or
     accounting principles. KPMG 's report on our consolidated financial statements for
27   the year ended December 31, 2002 was issued on an unqualified basis in conjunction
     with the publication of our Annual Report to Stockholders and the filing of our
28   Annual Report on Form 10-K.

- 11 -

During the two most recent years ended December 31, 2002 and 2001, and the subsequent interim period through the date of this report, we did not consult with Deloitte & Touche regarding any of the matters or events set forth in Item 304(a)(2)(i) and (ii) of Regulation S-K.

SureBeam provided KPMG with a copy of the foregoing disclosures. KPMG is in the process of reviewing the statements contained in this Form 8-K and we will file a letter from KPMG regarding such review when received.

39.     On July 30, 2003, the Company issued a press release entitled "SureBeam to Delay Earnings Announcement."  The press release stated in part:

SureBeam Corporation announced today that it is delaying the release of its second quarter earnings from its planned date of July 31, 2003.  As previously reported by the Company in its Current Report on Form 8-K filed on June 11, 2003, on June 9, 2003, Deloitte & Touche LLP ("Deloitte & Touche") was named as the Company's independent auditor for the year ending December 31, 2003, replacing KPMG LLP.  The Company's management has not completed preparation of the financial statements for the second quarter and Deloitte & Touche has not yet completed its review of those statements.  In particular, Deloitte & Touche has not completed their analysis on particular contracts and the Company's accounting treatment used for such contracts.

"We regret that this reporting delay is occurring," said SureBeam Chairman and Chief Executive Officer John C. Arme.  "We intend to work hard to complete the process and we anticipate that our earnings will be released by August 12."

40.     On August 12, 2003, the Company issued another press release entitled "SureBeam to Delay Earnings Announcement."  The press release stated in part:

SureBeam Corporation announced today that it is further delaying the release of its second quarter earnings from its planned release date of August 12, 2003.  The Company plans to file a Form 12b-25 with the Securities and Exchange Commission in connection with the Company's Form 10-Q for the second quarter of 2003 and the announcement of the Company's results for the second quarter of 2003 will be delayed until after the Company's Form 10-Q for the second quarter has been filed.

*Deloitte & Touch LLP ("Deloitte & Touche") has not completed its reviews of the Company's financial statements.  In particular, Deloitte & Touche has not completed its analysis on the accounting for specific contracts in prior years and the Company's accounting treatment used for its contracts.*

As previously announced by the Company in its Current Report on Form 8-K/A filed on June 11, 2003, on June 9, 2003, Deloitte & Touche LLP was named as the Company's independent auditor for the year ending December 31, 2003, replacing KPMG LLP.

41.     On August 21, 2003, the Company issued a press release entitled "SureBeam Dismisses Auditor; Seeks to Resolve Issues."  The press release stated in part:

SureBeam Corporation announced today that it is dismissing its independent public auditor Deloitte & Touche LLP ("Deloitte & Touche").  On June 9, 2003, Deloitte & Touche was named as SureBeam's independent auditor for the year ending

- 12 -

December 31, 2003, replacing KPMG LLP. Deloitte & Touche has raised issues of concern regarding accounting treatment used by SureBeam for certain transactions beginning in 2000. The Audit Committee and the Board of Directors of SureBeam have discussed these issues of concern with Deloitte & Touche and with SureBeam management.

The Company believes that its financial statements which were audited by national accounting firms and filed with the Securities and Exchange Commission, were appropriate based on the facts and circumstances that existed at the time. However, the Board of Directors has determined that the issues raised by Deloitte & Touche are sufficiently important and that it wants these issues to be definitively resolved. Accordingly, the Board's Audit Committee is interviewing other national accounting firms for the purpose of conducting an independent review of these issues.

The primary issues which had not been resolved to the satisfaction of Deloitte & Touche involve certain aspects of SureBeam's revenue recognition policies and certain contracts entered into in 2000 and affecting subsequent periods, all of which have been disclosed in various filings with the SEC, including SureBeam's Registration Statement on Form S-1, declared effective by the Securities and Exchange Commission on March 15, 2001, and SureBeam's Forms 10-K for the years ended December 31, 2001 and 2002. Each of these filings contained financial statements which had been audited by national accounting firms.

Deloitte & Touche, recently retained on June 9, 2003 as SureBeam's independent auditor, has not performed an audit of SureBeam's financial statements, nor has it completed the review for the quarter ended June 30, 2003, which would have been the first review it performed for SureBeam.

John Arme, the Chief Executive Officer and Chairman of the Board, stated: "We do not want questions about prior accounting decisions to continually affect SureBeam's ability to grow. The Board feels that the only way to put these issues to rest is to have these issues reviewed and resolved as soon as possible."

SureBeam will file a Current Report on Form 8-K providing further description regarding the dismissal of Deloitte & Touche and the issues raised. The Audit Committee will interview independent public auditors for the purpose of replacing Deloitte & Touche. The Audit Committee has directed Deloitte & Touche to provide complete information regarding its accounting analysis to SureBeam's successor auditor when such is appointed.

42.    On this news, SureBeam's stock dropped to $1.55 per share.

## SUREBEAM'S FALSE FINANCIAL REPORTING DURING THE CLASS PERIOD

43.    In order to inflate the price of SureBeam's stock and make its $67 million IPO successful, defendants caused the Company to falsely report its results for 2000 and 2001 through improper revenue recognition on work for a customer who was unable to pay for the work.

44.    The 2000 results were included in the Prospectus/Registration Statement and the 2001 results were included in the Form 10-Qs and Form 10-Ks filed with the SEC. The results were also included in press releases disseminated to the public.

45.    SureBeam inappropriately recorded transactions included in its 2000-2001 results, such that its financial statements were not a fair presentation of SureBeam's results and were presented in violation of Generally Accepted Accounting Principles ("GAAP") and SEC rules.

46.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

47.    In the IPO Prospectus, the Company represented its financial statements were presented in conformity with GAAP and that its revenue recognition complied with SAB No. 101. In SureBeam's 2001 Form 10-K, it represented that it recognized revenue in accordance with GAAP. These representations were false.

48.    Pursuant to GAAP, which describes the accounting for revenues, revenue should not be recognized unless there is persuasive evidence of an agreement, collection is probable and delivery has occurred. Pursuant to GAAP, as set forth in AICPA Statement of Position ("SOP") No. 81-1, revenue may be recognized under an incomplete contract, but only where certain conditions exist.

49.    SOP 81-1.23 states in part:

> The use of the percentage-of-completion method depends on the ability to make reasonably dependable estimates. For the purposes of this statement, "the ability to make reasonably dependable estimates" relates to estimates of the extent of progress toward completion, contract revenues, and contract costs. The division believes that the percentage-of-completion method is preferable as an accounting policy in circumstances in which reasonably dependable estimates can be made and in which all the following conditions exist:

- Contracts executed by the parties normally include provisions that clearly specify the enforceable rights regarding good or services to be provided and received by the parties, the consideration to be exchanged, and the manner and terms of settlement.

- The buyer can be expected to satisfy his obligations under the contract.

- The contractor can be expected to perform his contractual obligations.

50.     The SEC, in SAB No. 101, reiterates that revenue should not be recognized unless it is realizable or collectible, such that collectiblity is "reasonably assumed."

51.     During the Class Period, SureBeam improperly recognized revenue even though these conditions did not exist.  Tech Ion could not pay for the work done by SureBeam, for which SureBeam recognized $22.4 million in 2000 and 2001.  Thus, it was improper to record revenue under percentage of completion.

52.     Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for

1  accountability to prospective investors and to the public in general (FASB Statement of Concepts

2  No. 1, ¶50);

3           (e)    The principle that financial reporting should provide information about an

4  enterprise's financial performance during a period was violated.  Investors and creditors often use

5  information about the past to help in assessing the prospects of an enterprise.  Thus, although

6  investment and credit decisions reflect investors' expectations about future enterprise performance,

7  those expectations are commonly based at least partly on evaluations of past enterprise performance

8  (FASB Statement of Concepts No. 1, ¶42);

9           (f)    The principle that financial reporting should be reliable in that it represents

10  what it purports to represent was violated.  That information should be reliable as well as relevant

11  is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

12           (g)    The principle of completeness, which means that nothing is left out of the

13  information that may be necessary to insure that it validly represents underlying events and

14  conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

15           (h)    The principle that conservatism be used as a prudent reaction to uncertainty

16  to try to ensure that uncertainties and risks inherent in business situations are adequately considered

17  was violated.  The best way to avoid injury to investors is to try to ensure that what is reported

18  represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

19       53.    Further, the undisclosed adverse information concealed by defendants during the

20  Class Period is the type of information which, because of SEC regulations, regulations of the

21  national stock exchanges and customary business practice, is expected by investors and securities

22  analysts to be disclosed and is known by corporate officials and their legal and financial advisors to

23  be the type of information which is expected to be and must be disclosed.

**FIRST CLAIM FOR RELIEF**

**For Violation of §10(b) of the 1934 Act**
**and Rule 10b-5 Against All Defendants**

24

25

26       54.    Plaintiffs incorporate ¶¶1-53 by reference.

27       55.    During the Class Period, defendants disseminated or approved the false statements

28  specified above, which they knew or recklessly disregarded were materially false and misleading in

1   that they contained material misrepresentations and failed to disclose material facts necessary in

2   order to make the statements made, in light of the circumstances under which they were made, not

3   misleading.

4       56.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

5           (a)    Employed devices, schemes, and artifices to defraud;

6           (b)    Made untrue statements of material facts or omitted to state material facts

7   necessary in order to make statements made, in light of the circumstances under which they were

8   made, not misleading; or

9           (c)    Engaged in acts, practices, and a course of business that operated as a fraud

10  or deceit upon plaintiffs and others similarly situated in connection with their purchases of SureBeam

11  publicly traded securities during the Class Period.

12      57.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of

13  the market, they paid artificially inflated prices for SureBeam publicly traded securities. Plaintiffs

14  and the Class would not have purchased SureBeam publicly traded securities at the prices they paid,

15  or at all, if they had been aware that the market prices had been artificially and falsely inflated by

16  defendants' misleading statements.

17      58.    As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and

18  the other members of the Class suffered damages in connection with their purchases of SureBeam

19  publicly traded securities during the Class Period.

20  **SECOND CLAIM FOR RELIEF**

21  **For Violation of §20(a) of the 1934 Act**
    **Against All Defendants**

22

23      59.    Plaintiffs incorporate ¶¶1-58 by reference.

24      60.    The executive officers of SureBeam prepared, or were responsible for preparing, the

    Company's press releases and SEC filings. The Individual Defendants controlled other employees

25  of SureBeam. SureBeam controlled the Individual Defendants and each of its officers, executives

26  and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the

27  1934 Act.

28

                                            - 17 -

**CLASS ACTION ALLEGATIONS**

61.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased SureBeam publicly traded securities (the "Class") on the open market during the Class Period.  Excluded from the Class are defendants, directors and officers of SureBeam and their families and affiliates.

62.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  During the Class Period SureBeam had more than 75 million shares of stock outstanding, owned by thousands of persons.

63.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the 1934 Act was violated by defendants;

(b)     Whether defendants omitted and/or misrepresented material facts;

(c)     Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and

(d)     Whether defendants knew or recklessly disregarded that their statements were false and misleading.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; and such equitable/injunctive or other relief as the Court may deem proper.

- 18 -

1

## JURY DEMAND

2          Plaintiffs demand a trial by jury.

3     DATED:  August 27, 2003                    MILBERG WEISS BERSHAD
                                                   HYNES & LERACH LLP
4                                                WILLIAM S. LERACH
                                                 DARREN J. ROBBINS
5

6

7                                                _____
                                                    DARREN J. ROBBINS
8
                                                 401 B Street, Suite 1700
9                                                San Diego, CA  92101
                                                 Telephone:  619/231-1058
10                                               619/231-7423 (fax)

11                                               BLUMENTHAL & MARKHAM
                                                 NORMAN BLUMENTHAL
12                                               DAVID R. MARKHAM
                                                 2255 Calle Clara
13                                               La Jolla, CA  92037
                                                 Telephone:  858/551-1223
14                                               858/551-1232 (fax)

15                                               FARUQI & FARUQI, LLP
                                                 NADEEM FARUQI
16                                               320 East 39th Street
                                                 New York, NY  10016
17                                               Telephone:  212/983-9330
                                                 212/983-9331 (fax)

18                                               Attorneys for Plaintiffs

19

20

21

22

23

24

25

26

27

28     G:\Cases-SD\COMPLNTS\SureBeam.cpt

## CERTIFICATION OF EDWARD WEISS
## IN SUPPORT OF CLASS ACTION COMPLAINT

Edward Weiss ("plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint prepared by counsel and has authorized its filing.

2.    Plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiffs' counsel or in order to participate in any private action arising under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    During the proposed Class Period, plaintiff executed the following transactions relating to Surebeam Corporation:

Purchase of 225 shares at $1.95 on 09/27/02

5.    In the past three years, plaintiff has not sought to serve as a representative party on behalf of a class in the following action filed under the federal securities laws.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs

and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

The foregoing are, to the best of my knowledge and belief, true and correct statements.

August 25, 2003

*Edward Weiss*

EDWARD WEISS

# CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

_Meluge Mauet_ ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below:

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost

SUREBEAM

1  wages) directly relating to the representation of the class as ordered or approved
2  by the court.
3       I declare under penalty of perjury that the foregoing is true and correct.
4  Executed this 26 day of August __, 2003.

5
6                         *[signature]*
7                         Delaware Charter
8                         Gbfc Trust TR
9                         Mehyu Manaste FKA
10                        R/O
11

- 2 -                                                    SUREBEAM

# Schedule of Realized Gains and Losses

*All Tax Years*

DELAWARE CHARTER GTY TRUST TR MELVYN MANASTER IRA R/O 5466 RUTGERS LA JOLLA CA 92037          8889-7816

| Quantity | Name | Open Date | Cost Amount | Trade Price | Close Date | Close Amt | Close Price | Realized |
|---|---|---|---|---|---|---|---|---|
| 2,000 | SUREBEAM CORP | 03/26/2001 | 20,167.00 | 10.0312 | 05/17/2001 | 28,629.36 | 14.4000 | 8,462.36 |
| 1,000 | SUREBEAM CORP | 03/26/2001 | 10,112.50 | 10.0625 | 05/17/2001 | 14,314.68 | 14.4000 | 4,202.18 |
| 2,000 | SUREBEAM CORP | 03/28/2001 | 20,225.00 | 10.0625 | 05/18/2001 | 29,894.50 | 15.0000 | 9,669.50 |
| 4,400 | SUREBEAM CORP | 10/18/2001 | 37,120.50 | 8.3900 | 10/23/2001 | 42,106.58 | 9.6000 | 4,986.08 |
| 200 | SUREBEAM CORP | 10/16/2001 | 1,751.45 | 8.6000 | 10/23/2001 | 1,913.93 | 9.6000 | 162.48 |
| 300 | SUREBEAM CORP | 10/16/2001 | 2,635.67 | 8.6500 | 10/23/2001 | 2,870.90 | 9.6000 | 235.23 |
| 100 | SUREBEAM CORP | 10/16/2001 | 882.62 | 8.6900 | 10/23/2001 | 956.96 | 9.6000 | 74.34 |
| 3,800 | SUREBEAM CORP | 10/17/2001 | 38,041.64 | 9.8700 | 10/23/2001 | 36,364.81 | 9.6000 | -1,676.83 |
| 600 | SUREBEAM CORP | 10/17/2001 | 6,006.59 | 9.9700 | 10/23/2001 | 5,843.80 | 9.7700 | -162.78 |
| 300 | SUREBEAM CORP | 10/17/2001 | 3,003.28 | 9.9700 | 10/23/2001 | 2,928.20 | 9.8000 | -75.08 |
| 200 | SUREBEAM CORP | 10/17/2001 | 1,988.00 | 8.9000 | 10/23/2001 | 1,952.14 | 9.8000 | -35.86 |
| 100 | SUREBEAM CORP | 10/17/2001 | 994.00 | 9.9000 | 10/23/2001 | 971.97 | 9.7500 | -22.03 |
| 500 | SUREBEAM CORP | 11/26/2001 | 5,599.50 | 11.1400 | 11/26/2001 | 5,948.31 | 11.9600 | 348.81 |
| 1,010 | SUREBEAM CORP | 11/26/2001 | 11,312.00 | 11.1500 | 11/28/2001 | 12,015.59 | 11.9500 | 703.59 |
| 2,000 | SUREBEAM CORP | 11/26/2001 | 22,400.00 | 11.1600 | 11/29/2001 | 24,894.67 | 12.5000 | 2,494.67 |
| 2,300 | SUREBEAM CORP | 12/21/2001 | 23,697.06 | 10.2500 | 01/08/2002 | 22,469.16 | 9.8300 | -1,207.80 |
| 1,300 | SUREBEAM CORP | 03/13/2002 | 7,843.50 | 5.9900 | 03/13/2002 | 9,044.93 | 7.0000 | 1,201.43 |
| 700 | SUREBEAM CORP | 03/13/2002 | 4,228.00 | 6.0000 | 03/13/2002 | 4,870.36 | 7.0000 | 642.36 |
| 1,000 | SUREBEAM CORP | 03/13/2002 | 6,040.00 | 6.0400 | 03/13/2002 | 7,005.39 | 7.0500 | 965.39 |
| 1,000 | SUREBEAM CORP | 03/13/2002 | 6,040.00 | 6.0000 | 03/13/2002 | 7,019.89 | 7.0600 | 979.89 |
| 1,000 | SUREBEAM CORP | 03/13/2002 | 6,040.00 | 6.0000 | 03/13/2002 | 6,029.90 | 6.0700 | -10.10 |
| 1,000 | SUREBEAM CORP | 03/13/2002 | 6,040.00 | 8.0000 | 03/13/2002 | 6,074.90 | 6.0700 | 34.90 |
| 1,397.2000 | SUREBEAM CORP | 11/19/1999 | 9,121.86 | | 08/06/2002 | 4,133.97 | 3.0000 | -4,987.89 |
| 1,047.9000 | SUREBEAM CORP | 11/22/1999 | 7,487.04 | | 08/06/2002 | 3,100.47 | 3.0000 | -4,386.57 |
| 1,454.8000 | SUREBEAM CORP | 11/29/1999 | 12,023.73 | | 08/06/2002 | 4,304.70 | 3.0000 | -7,719.03 |
| 640.9000 | SUREBEAM CORP | 11/29/1999 | 5,296.59 | | 10/18/2002 | 1,896.42 | 3.0000 | -3,400.17 |
| 489.0200 | SUREBEAM CORP | 12/03/1999 | 4,144.37 | | 10/18/2002 | 1,447.01 | 3.0000 | -2,697.36 |
| 1,257.4800 | SUREBEAM CORP | 12/09/1999 | 10,378.38 | | 10/18/2002 | 3,720.89 | 3.0000 | -6,657.49 |
| 698.6000 | SUREBEAM CORP | 12/15/1999 | 6,209.72 | | 10/18/2002 | 2,057.16 | 3.0000 | -4,142.56 |
| 489.0200 | SUREBEAM CORP | 01/07/2000 | 4,979.11 | | 10/18/2002 | 1,447.01 | 3.0000 | -3,532.10 |
| 908.1800 | SUREBEAM CORP | 01/31/2000 | 10,819.97 | | 10/18/2002 | 2,687.31 | 3.0000 | -8,132.66 |
| 516.6000 | SUREBEAM CORP | 03/13/2000 | 6,506.51 | | 10/21/2002 | 1,529.24 | 3.0000 | -4,977.27 |
| 1,579 | SUREBEAM CORP | 03/13/2000 | 19,879.61 | | 10/21/2002 | 6,220.69 | 4.0000 | -13,658.92 |
| 986 | SUREBEAM CORP | 03/23/2000 | 13,616.66 | | 10/21/2002 | 3,884.50 | 4.0000 | -9,732.16 |
| 493 | SUREBEAM CORP | 10/20/2000 | 2,017.82 | 4.0900 | 05/08/2003 | 1,108.47 | 2.2700 | -909.35 |
| 1,602.8000 | SUREBEAM CORP | 10/20/2000 | 6,560.16 | 4.0800 | 05/08/2003 | 3,590.10 | 2.2600 | -2,970.06 |
| 1,397.2000 | SUREBEAM CORP | 11/02/2000 | 5,847.79 | 4.1850 | 05/08/2003 | 3,129.58 | 2.2600 | -2,718.21 |
| 1,806.4000 | SUREBEAM CORP | 03/23/2000 | 24,974.00 | 13.8100 | 05/08/2003 | 4,665.99 | 2.2700 | -20,908.01 |
| 698.6000 | SUREBEAM CORP | 08/23/2000 | 4,287.30 | 6.1080 | 05/08/2003 | 1,570.72 | 2.2700 | -2,696.58 |

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**FILED**

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| EDWARD WEISS and DELAWARE CHARTER GTY. TRUST TR. MELVYN MANASTER IRA R/O, On Behalf of Themselves and All Others Similarly Situated, | SUREBEAM CORPORATION, LAWRENCE A. OBERKFELL and DAVID A. RANE, |

03 AUG 27 PM 2:09

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF **New York** (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT (IN U.S. PLAINTIFF CASES ONLY) |
|---|---|

BY: _____  DEPUTY

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Darren J. Robbins     619/231-1058 MILBERG WEISS BERSHAD HYNES & LERACH LLP 401 B Street, Suite 1700 San Diego, CA  92101 | '03 CV 01721 JM / [JMA] |

| II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY) | III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT (For Diversity Cases Only) |
|---|---|

| | | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question (U.S. Government Not a Party) | Citizen of This State ☐1 | ☐1 | Incorporated or Principal Place of Business in This State | ☐4 | ☐4 |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III | Citizen of Another State ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| | | Citizen or Subject of a Foreign Country ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. CAUSE OF ACTION** (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).

COMPLAINT FOR VIOLATION OF §§10(b) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934; 15 U.S.C. §78j(b) and §78t(a)

**V. NATURE OF SUIT** (PLACE AN X IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reappointment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury- Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayments &Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 640 RR & Truck | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| | | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities Exchange |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 862 Black Lung (923) | |
| | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC |
| ☐ 160 Stockholders Suits | ☐ 360 Other Personal Injury | | ☐ 710 Fair Labor Standards Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 790 Other Labor Litigation | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 791 Empl. Ret. Inc. | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | Security Act | | |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 950 Constitutionality of State |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prisoner Conditions | | | |

**VI. ORIGIN** (PLACE AN X IN ONE BOX ONLY)

☒ 1 Original Proceeding  ☐ 2 Removal from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

| VII. REQUESTED IN COMPLAINT: | ☒ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23 | DEMAND $ | Check YES only if demanded in complaint: JURY DEMAND: ☒ YES  ☐ NO |
|---|---|---|---|

| VIII. RELATED CASE(S) IF ANY (See Instructions): | JUDGE | | Docket Number |
|---|---|---|---|

DATE  **August 27, 2003**        SIGNATURE OF ATTORNEY OF RECORD

CB $150 96749 08/27/03

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)